**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-02966

GEORGE ASSAD, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,
v.

U.S. ENERGY CORP., ENERGY ONE LLC, DAVID A. VELTRI, J. WELDON CHITWOOD, JOHN G. HOFFMAN, JAVIER F. PICO, and APEG ENERGY II, L.P.,

Defendants.

---

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

---

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. On or around October 3, 2017, U.S. Energy Corp.'s ("U.S. Energy" or the "Company") Board of Directors (the "Board" or "Individual Defendants") caused the Company and its wholly owned subsidiary, Energy One LLC ("Energy One"), to enter into an exchange agreement (the "Exchange Agreement") with APEG Energy II, L.P. ("APEG"), an entity controlled by Angelus Private Equity Group, LLC ("Angelus"), which currently holds $6,000,000 in principal amount of loans under a credit agreement between Energy One and APEG (the "Credit Facility").

2. Pursuant to the terms of the Exchange Agreement, APEG will exchange $4,463,380 of outstanding borrowings under the Credit Facility for 5,819,270 new shares of U.S.

1

Energy common stock at an exchange price of $0.767, representing only a 1.3% premium over the 30-day volume weighted average price of the Company's common stock on September 20, 2017. In addition, the Company will pre-pay $600,000 of the outstanding principal under the Credit Facility, leaving approximately $937,000 outstanding, and the Company will pay at closing any accrued, unpaid interest on the Credit Facility held by APEG (collectively, the "Proposed Transaction"). Immediately following the close of the Proposed Transaction, APEG will hold approximately 49.3% of U.S. Energy's outstanding common stock.

3. On October 31, 2017, defendants filed a Definitive Proxy Statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. Specifically, the Proxy Statement solicits stockholder approval at a special stockholder meeting to be held on December 27, 2017 of two items: (i) the issuance of 5,819,270 new shares of U.S. Energy common stock in connection with the Proposed Transaction; and (ii) an amendment, at the discretion of the Board, to the Company's articles of incorporation to implement a reverse stock split of the Company's outstanding common stock at a reverse split ratio of 1-for-5 (the "Reverse Stock Split").[1]

4. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction over the claims asserted herein pursuant to Section 27

---

[1] The Proxy Statement also solicits stockholder approval of an adjournment of the special stockholder meeting, if necessary, to establish a quorum or to permit further solicitation of proxies if there are not sufficient votes at the time of the special meeting cast in favor of the Proposed Transaction or the Reverse Stock Split.

of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of U.S. Energy common stock.

9. Defendant U.S. Energy is a Wyoming corporation and maintains its principal executive offices at 980 S. Cherry Street, Suite 1515, Denver, CO 80246. U.S. Energy's common stock is traded on The NASDAQ Capital Market ("NASDAQ") under the ticker symbol "USEG."

10. Defendant Energy One is a Wyoming limited liability company, a wholly-owned subsidiary of U.S. Energy, and a party to the Exchange Agreement.

11. Defendant David A. Veltri ("Veltri") is Chairman of the Board, and the President and Chief Executive Officer ("CEO") of the Company.

12. Defendant J. Weldon Chitwood is a director of the Company.

13. Defendant John G. Hoffman is a director of the Company.

14. Defendant Javier F. Pico is a director of the Company.

15. The defendants identified in paragraphs 11 through 14 are collectively referred to

herein as the "Individual Defendants."

16. Defendant APEG is a Texas limited partnership that is controlled by Angelus and is a party to the Exchange Agreement.

## CLASS ACTION ALLEGATIONS

17. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of U.S. Energy (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

18. This action is properly maintainable as a class action.

19. The Class is so numerous that joinder of all members is impracticable. As of November 14, 2017, there were approximately 5,983,498 shares of U.S. Energy common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

20. Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

21. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

22. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible

standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

23.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company*

24.     U.S. Energy is an independent energy company focused on the acquisition and development of oil and gas producing properties in the continental United States.  The Company's business activities are currently focused in South Texas and the Williston Basin in North Dakota, although the Company does not intend to limit its focus to these geographic areas.  U.S. Energy focuses on increasing production, reserves, revenues, and cash flow from operations while managing its level of debt.

25.      The Company has historically explored for and produced oil and gas through a non-operator business model.  As a non-operator, U.S. Energy relies on its operating partners to propose, permit, drill, complete, and produce oil and gas wells.  Before a well is drilled, the operator provides all oil and gas interest owners in the designated well the opportunity to participate in the drilling and completion costs and revenues of the well on a pro-rata basis.  The Company's operating partners also produce, transport, market, and account for all oil and gas production, and the Company is currently developing its capability to operate properties.

*The Credit Facility and Background Leading to the Proposed Transaction*

26. The following facts are largely derived from the Proxy Statement filed by the Company.

27. On May 2, 2017, APEG purchased and assumed all of Wells Fargo Bank N.A.'s rights and obligations as the lender to Energy One under the Credit Facility. Concurrently with the purchase of the Credit Facility by APEG, the Company, Energy One, and APEG entered into a limited forbearance agreement, pursuant to which APEG agreed not to exercise its rights and remedies arising as a result of certain existing and prospective events of default under the Credit Facility until July 30, 2017.

28. The Company's management met with APEG on June 2, 2017 and June 13, 2017 at the Company's offices and APEG's offices, respectively, to discuss potential transactions to extend the maturity of the Credit Facility and amend the financial covenant ratios. During these meetings, the parties discussed the possibility of exploring a deleveraging transaction through a refinance of the existing Credit Facility or a debt for equity exchange. During both meetings APEG representatives requested additional information to perform due diligence.

29. After a period of due diligence on the part of APEG and negotiations between the Company and APEG, on June 29, 2017, the Company announced a two-year extension of the Credit Facility through July 30, 2019, along with an amendment of the financial covenant ratios governing the Credit Facility.

30. The Board held a meeting on July 17, 2017, at which the Company's President and CEO, Individual Defendant Veltri, updated the Board on the status of discussions with APEG, and "other potential acquisition and divestiture opportunities for the Company," although the Proxy Statement does not disclose the specific alternatives and "other potential acquisition

6

and divestiture opportunities for the Company" considered by the Board or the reasons the Board determined not pursue each of the alternatives.  The Board discussed strategic options with management, including the status of negotiations with APEG, and instructed management to continue such discussions and report results back to the Board, if appropriate.

31.     On August 2, 2017, undisclosed "Company representatives" met with APEG to further discuss the economic terms of a proposed debt for equity exchange and the terms of a proposed standstill agreement (the "Standstill Agreement").  The Company and APEG exchanged drafts of documents although no agreement was reached on an exchange ratio or the details of the Standstill Agreement.  The Proxy Statement, however, fails to disclose the principal financial and other terms that were proposed by each party during the negotiations.

32.     On August 4, 2017, the Company exchanged financial terms of a potential transaction with APEG, however no agreement was reached on the terms presented.  During August 2017, the Company and its outside legal counsel, Kutak Rock LLP, further negotiated with APEG and its counsel and revised the terms of the proposed debt for equity exchange and discussed the economic and legal terms of the potential transaction.  The Company and APEG continued to negotiate and exchange revised drafts of definitive transaction documents throughout September.  Again, the Proxy Statement fails to disclose any of the principal financial and other terms that were proposed by each party.

33.     On September 28, 2017, undisclosed "Company representatives" met with APEG and reached an agreement on the economic terms of the Proposed Transaction.  Although undisclosed in the Proxy Statement, based on the Exchange Agreement and Standstill Agreement filed as exhibits to the Form 8-K filed on October 5, 2017 announcing the Proposed Transaction, it is apparent that Veltri, on behalf of the Company, executed final versions of the Exchange

Agreement and Standstill Agreement with APEG *without first obtaining approval from the Board*.

34. Also undisclosed in the Proxy Statement, on October 2, 2017, Veltri, on behalf of the Company, and APEG entered into a letter agreement (the "Letter Agreement") that provided that the Exchange Agreement and the Standstill Agreement, each of which were dated September 28, 2017, "are subject to approval by the Company's Board of Directors and shall not become effective until the Company's Board provided such approval."

35. On October 3, 2017, the Board held a meeting, at which Veltri finally updated the Board on the status of the Exchange Agreement and the other definitive agreements. According to the Proxy Statement, "Mr. Veltri informed the Board that based on the exchange price, the financial position of the Company and other matters, the terms of the Exchange Agreement and the transactions contemplated by the Exchange Agreement, taken in the aggregate, were fair from a financial point of view to the Company and to its shareholders." Following discussion among the Board, the Board authorized and approved the execution of the Exchange Agreement.

36. On October 5, 2017, the Company issued a press release announcing the Exchange Agreement and filed a Form 8-K, which attached the Exchange Agreement, the Standstill Agreement, the Letter Agreement, and the press release.

*The Reverse Stock Split*

37. In addition to seeking stockholder approval of the issuance of new shares of U.S. Energy common stock pursuant to the Exchange Agreement, the Company is also seeking stockholder approval of the 1-for-5 Reverse Stock Split to, according to the Proxy Statement, maintain its listing on the NASDAQ.

38. On March 23, 2017, NASDAQ notified the Company that the bid price of its

8

listed security had closed at less than $1 per share over the previous 30 consecutive business days, and, as a result, did not comply with NASDAQ Stock Market Rule 5550(a)(2) (the "Rule").  In accordance with Listing Rule 5810(c)(3)(A), the Company was provided 180 calendar days, or until September 19, 2017, to regain compliance with the Rule.  At the time of the filing of the Proxy Statement on October 31, 2017, the Company had not regained compliance with the Rule.  According to the Proxy Statement, the "Reverse Stock Split will increase the trading price of the Company's Commons Stock above $1.00 per share and, accordingly, should allow the Company to maintain its listing on The NASDAQ Capital Market.  However, if the Company meets NASDAQ's listing requirements prior to the Special Meeting, the Board, in its discretion, may elect not to effect the Reverse Stock Split."

39.     On November 17, 2017, the Company filed a Form 8-K with the SEC, announcing that, on November 15, 2017, U.S. Energy received a notification letter from NASDAQ indicating that NASDAQ has determined that the Company has regained compliance with all of NASDAQ's listing requirements, and has determined to continue the listing of the Company's securities on the NASDAQ.

*The Proxy Statement Omits Material Information, Rendering It False and Misleading*

40.     On October 31, 2017, defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction and the Reverse Stock Split.

41.     The Proxy Statement omits material information with respect to the Proposed Transaction and the Reverse Stock Split, which renders the Proxy Statement false and misleading.

42.     First, the Proxy Statement omits material information regarding the current and future value of U.S. Energy.  In connection with the Proposed Transaction, U.S. Energy agreed

to exchange $4,463,380 of its outstanding debt held by APEG under the Credit Facility for 5,819,270 new shares of U.S. Energy common stock, which represents 49.3% of the Company's outstanding common stock, at an exchange price of $0.767 representing a 1.3% premium over the 30-day volume weighted average price of the Company's common stock on September 20, 2017.

43. Yet, despite giving up a controlling interest in the Company (which would typically yield a substantial control premium far in excess of 1.3%), the Proxy Statement is silent as to whether the Company engaged a financial advisor to assess the financial fairness of the terms of the Exchange Agreement. Interestedly, the Proxy Statement states that, during the final Board meeting held on October 3, 2017, "Mr. Veltri informed the Board that based on the exchange price, the financial position of the Company and other matters, the terms of the Exchange Agreement and the transactions contemplated by the Exchange Agreement, taken in the aggregate, were fair from a financial point of view to the Company and to its shareholders."

44. The Proxy Statement must fully disclose Veltri's and the Board's bases for concluding that the Proposed Transaction is financially fair to the Company's stockholders.

45. Further, if the Board did not engage or rely on a financial advisor to opine on the financial fairness of the Proposed Transaction, the Proxy Statement must be explicit on this point, and it must disclose the reason the Board determined not to engage such an advisor in connection with the Proposed Transaction.

46. If such a financial advisor was engaged, the Proxy Statement must disclose a fair summary of any valuation analyses, and any attendant inputs, assumptions, and conclusions, relied upon by the financial advisor. Further, the Proxy Statement must disclose the amount of compensation earned by the financial advisor in connection with the engagement, as well as any

past services or any other information that might give rise to potential conflicts of interest of the financial advisor in relation to U.S. Energy, APEG, or any of their affiliates.

47. Further, the Proxy Statement lists a number of "countervailing factors" that the Board considered in determining to approve the Proposed Transaction, including the tax effect of the Proposed Transaction. Specifically, according to the Proxy Statement, the Board considered:

> Future use of the Company's federal net operating loss carryforwards ("NOLS") may be limited if the Company experiences an "ownership change" in which stock held by the Company's 5-percent shareholders increases by more than 50 percentage points over the lowest percentage of stock held by such shareholders during the three-year period preceding such ownership change. The issuance of Common Stock to APEG pursuant to the Exchange may result in such an ownership change. If there is an ownership change, a substantial portion of the Company's NOLs may be eliminated or restricted. In particular, the use of the Company's NOLS on a going forward basis generally will be limited to amount equal to the value of the Company as of the ownership change date multiplied by the applicable long-term tax exempt rate as determined by the Internal Revenue Service. Moreover, the Company would need to reduce its deferred tax assets reflecting the restricted use of these NOLs when such an ownership change occurs.

48. Notably, according to the Company's most recent Form 10-Q filed with the SEC on November 14, 2017, "as of December 31, 2016 the Company had net operating loss and percentage depletion carryovers of approximately $74.7 million and $2.5 million, respectively," which may be carried back two years and forward twenty years from the year the net operating loss ("NOL") was generated.

49. Although the Proxy Statement discloses that the Proposed Transaction "may" result in an ownership change, and may eliminate or restrict a "substantial portion" of the Company's NOLs, the Proxy Statement fails to quantify and disclose the amount of NOLs that will be restricted in the future. This information is material to stockholders. Indeed, if the Proposed Transaction eliminates all or a substantial portion of the Company's $74.7 million in NOLs, U.S. Energy stockholders might determine that APEG's elimination of only $4,463,380

11

in debt in exchange for a 49.3% equity interest in the Company is not favorable to them.

50. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) Reasons for the Exchange Agreement; and (ii) Analysis of the Exchange.

51. Second, the Proxy Statement omits material information regarding potential conflicts of interest of Company management and Board members due to their continued employment and directorships following the close of the Proposed Transaction.

52. During the negotiations of the Proposed Transaction, the Company and APEG entered into the Standstill Agreement, pursuant to which APEG (which will own a controlling interest in the Company following the close of the Proposed Transaction) is prohibited from proposing or offering to seek representation on the Board or otherwise seek to control Company management, the Board, or the Company's policies for a period of one year. In addition, in the press release announcing the Proposed Transaction, Managing Partners at Angelus, Paul Haarman and Patrick Duke, said in a joint statement: "We are extremely excited about the opportunity to strategically partner with the shareholders and management of U.S. Energy. With a transformed and deleveraged balance sheet and an experienced management team like theirs, we see tremendous opportunities for growth and value expansion for both U.S. Energy and Angelus Private Equity Group investors. We are very excited about what the future holds for all involved."

53. Despite the continued employment and directorships of the Company's management and Board members, the Proxy Statement fails to disclose the timing and nature of all communications regarding the post-exchange retention of U.S. Energy management and Board members, including who proposed the continued retention. Communications regarding

continued employment and directorship during the negotiation of the underlying Proposed Transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

54. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) Background of the Exchange Agreement; (ii) Reasons for the Exchange Agreement; and (iii) Analysis of the Exchange.

55. Third, the Proxy Statement omits material information regarding the background leading to the Proposed Transaction.

56. The Proxy Statement vaguely indicates that representatives of the Company and APEG negotiated the terms of the Exchange Agreement during August and September 2017, but it fails to disclose to stockholders the principal financial and other terms that were proposed by each party during the negotiations. Instead, the Proxy Statement only provides stockholders with the final terms of the Exchange Agreement that was ultimately agreed to by U.S. Energy and APEG. This information is material to stockholders, who would want to assess the efficacy and aggressiveness of U.S. Energy management in negotiations, particularly since APEG has agreed in the Standstill Agreement to refrain from changing or seeking representation on the Board or otherwise seeking to control Company management, the Board, or the policies of the Company following the completion of the Proposed Transaction.

57. Further, the Proxy Statement vaguely indicates that, in addition to negotiating the Proposed Transaction with APEG, the Board discussed "other potential acquisition and

divestiture opportunities for the Company." The Proxy Statement fails to provide stockholders with a description of the specific alternatives and "other potential acquisition and divestiture opportunities for the Company," and the reasons the Board determined that these alternative options were not viable. In light of the fact that U.S. Energy's current stockholders' equity interest in the Company will be substantially diluted following the close of the Proposed Transaction, stockholders are entitled to the full disclosure of the alternatives considered by the Board and the Board's reasons for declining to pursue each alternative so that they can make a fully informed voting decision with respect to the Proposed Transaction.

58. The Proxy Statement also fails to disclose the identity of the "Company representatives" that negotiated the terms of the Proposed Transaction, and the fact that Individual Defendant Veltri executed the Exchange Agreement and Standstill Agreement on September 28, 2017, prior to receiving final approval from the Board. As it is currently cast, the Proxy Statement implies that the Exchange Agreement and Standstill Agreement were finalized on September 28, 2017 and executed on October 3, 2017 following Board approval. That is false, however, as evidenced by the Letter Agreement dated October 2, 2017, which provides that the Exchange Agreement and the Standstill Agreement, each of which were dated September 28, 2017, "are subject to approval by the Company's Board of Directors and shall not become effective until the Company's Board provided such approval."

59. Finally, with respect to the Reverse Stock Split, the Proxy Statement indicates that, if the Reverse Stock Split is approved by U.S. Energy's stockholders, "our Board will cause the filing of the Articles of Amendment with the Secretary of State of the State of Wyoming promptly following the Special Meeting, provided that if the Company meets NASDAQ's listing requirements prior to the Special Meeting, the Board, in its discretion, may elect not to effect the

Reverse Stock Split." Following the filing of the Proxy Statement, the Company announced in the Form 8-K filed on November 17, 2017 that NASDAQ has determined that the Company has regained compliance with all of NASDAQ's listing requirements, and has determined to continue the listing of the Company's securities on the NASDAQ.

60. In light of this information, the Proxy Statement must be updated to set forth the Board's current intentions with respect to the Reverse Stock Split, and more specifically, whether the Board currently intends to implement the Reverse Stock Split if it is approved by U.S. Energy's stockholders. This information is material to stockholders because, as noted in the Proxy Statement, there are various negative factors associated with reverse stock splits, including: the negative perception of reverse stock splits held by some investors, analysts, and other stock market participants; the fact that the stock price of some companies that have effected reverse stock splits has subsequently declined, with a corresponding decline in market capitalization; the adverse effect on liquidity that might be caused by a reduced number of shares outstanding; and the costs associated with implementing a reverse stock split.

61. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) Background of the Exchange Agreement; (ii) Reasons for the Exchange Agreement; (iii) Analysis of the Exchange; and (iv) Reasons for the Reverse Stock Split.

62. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to U.S. Energy's stockholders.

### COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and U.S. Energy**

63. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

64.     The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. U.S. Energy is liable as the issuer of these statements.

65.     The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

66.     The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

67.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

68.     The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

69.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

70.     Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and APEG

71. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

72. The Individual Defendants and APEG acted as controlling persons of U.S. Energy within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of U.S. Energy and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

73. Each of the Individual Defendants and APEG was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

74. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Proxy Statement.

75. APEG also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

76. By virtue of the foregoing, the Individual Defendants and APEG violated Section 20(a) of the 1934 Act.

77. As set forth above, the Individual Defendants and APEG had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: December 11, 2017    **CODY-HOPKINS LAW FIRM**

By: _____
Karen Cody-Hopkins #35367
4610 S. Ulster Street
Denver, CO 80237
T:(303) 221-4666
F: (303) 221-4374
E: Karen@codyhopkinslaw.com
*Attorney for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310

**RM LAW, P.C.**
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
(484) 324-6800

19